# In the United States Court of Federal Claims

No. 08-48C
(Filed October 31, 2008)

```
* * * * * * * * * * * * * * * * * * * * * *    *
                                               *
MALCOLM B. BLANKENSHIP III,                    *   Military pay; claim under 37
                                               *   U.S.C. § 204 (2000), for back
              Plaintiff,                       *   pay and allowances; review of
                                               *   decision of military correction
      v.                                       *   board; justiciability; whether
                                               *   failure to follow syllabus
THE UNITED STATES,                             *   requiring remedial flight training
                                               *   by Navy aviation program
              Defendant.                       *   entitles serviceman to award of
                                               *   wings; reliance on advisory
* * * * * * * * * * * * * * * * * * * * * *    *   opinion.
```

William E. Cassara, Evans, GA, for plaintiff.

Christopher L. Krafchek, Washington, DC, with whom was Assistant Attorney General Gregory G. Katsas, for defendant. LCDR Marc S. Brewen, Office of the Judge Advocate General, Washington, DC, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER,** Judge.

Malcolm B. Blankenship III ("plaintiff") challenges the decision of the Board for Correction of Naval Records (the "BCNR") sustaining his attrition from the Naval Aviation Training Program and denying plaintiff's application for correction of military records under 10 U.S.C. § 1552 (2000). Plaintiff now seeks judicial relief in the form of back pay and allowances pursuant to 37 U.S.C. § 204 (2000).

Defendant seeks to dismiss plaintiff's claim as not justiciable. Argument is deemed unnecessary by the transferee judge.

## FACTS

The following facts are derived from the Administrative Record (the "AR"). On August 3, 1999, plaintiff entered into the Aviation Officer Candidate Program, which

required him to enlist in the United States Naval Reserves. Following his successful completion of Officer Candidate School, on January 28, 2000, plaintiff was assigned to train as a Student Naval Pilot (the "SNP") with the Naval Aviation Training Program for the United States Naval Reserve, Naval Aviation Schools Command, NAS Pensacola, Florida. Plaintiff was assigned to Training Squadron Thirty-One.  The Student Naval Aviation Program (the "SNA Program") consists of four primary phases or wings: 1) aviation indoctrination; 2) primary; 3) intermediate; and 4) advanced.  Each training phase is divided into stages that must be completed successfully before the trainee advances to the next phase, and within each stage the trainee must complete several training flights.  After completing a flight, a SNP receives a form evaluating his performance as either an "up" (satisfactory) or a "down" (unsatisfactory), and a notation is made as to whether the SNP completed the flight.  This evaluation form is called an Aviation Training Jacket ("ATJ").  To successfully complete each stage, the SNP must pass each training flight prescribed within the particular stage.

Pursuant to paragraph 700 of the Naval Air Training Instruction 1500.4F ("CNATRAINST 1500.4F" or the "Instruction") "jacket reviews," a review of multiple ATJs, must be conducted regularly so that the flight instructor and the SNP can track progress and flag poor or marginal performance. Id. ¶ 700(g).  Four grade level definitions measure overall performance: 1) Unsatisfactory (numeric grade 1.0); 2) Below Average (numeric grade 2.0); 3) Average (numeric grade 3.0); 4) Above Average (numeric grade 4.0). Id. ¶ 703.  An instructor considers a number of criteria in assessing a SNP's grade level, such as "head work," the ability of the SNP to "understand and grasp the meaning of instructions, demonstrations, and explanations"; and "basic airwork," which measures the SNP's mastery of power and flight controls.  Id. ¶ 704(a),(c).

A SNP is flagged as "mid-stage or end-of-stage marginal," if the SNP has "a student flight grade 1.2 or greater standard deviations below the squadron average for an active or completed stage respectively."  Id. ¶ 717.  Marginal mid-stage or end-of-stage does not measure unsatisfactory but substandard performance. Id.  Following this designation, a "pink sheet" is issued to document the problem and any actions taken, and a trend analysis is performed. Id.  The flight instructors can "take action" by recommending extra flight training, providing counseling and advice, or conducting interviews to see if the SNP has any medical or family issues affecting performance. Id. ¶ 718.  However, if a SNP completes multiple stages as marginal, either mid-stage or end-of-stage, and exhibits an overall trend of unsatisfactory performance, the SNP can be referred to the Student Progress Disposition Board (the "PRB") to determine whether the SNP should continue training. Id. ¶¶ 718-19. The PRB's determination is forwarded to the commanding officer, whose endorsement is forwarded to the training wing's commander to determine retention or attrition in the SNA program. Id. ¶ 720(c).

Plaintiff successfully completed the Aviation Indoctrination training phase in June 2000 and began the primary phase on August 18, 2000. Shortly thereafter, on August 31, 2000, plaintiff received a "supplementary jacket form," which informed plaintiff about the Naval Aviation Training Advisor Program (the "NATAP") and also outlined the details of his responsibility to the NATAP. The NATAP policy form recited that the program was established "for the benefit of Student Naval Pilots (SNP). It is the responsibility of each student to use this program throughout all phases of flight training. The advisor is the first link in the chain of command between SNP's and the Flight Leader." AR Tab 1 at 9. The NATAP policy required each SNP to notify his advisor of 1) any personal conflicts that may affect his performance; 2) "progression in the syllabus"; 3) upcoming scheduled ATJ reviews; and 4) "a marginal or unsat[isfactory] event . . ., flight and/or academic." AR Tab 1 at 9. Plaintiff signed the NATAP form acknowledging that he had read and understood the purpose of, and his responsibilities to, the program.

Plaintiff successfully completed the first three stages of the training. He received some "unsatisfactory" ratings in the primary and intermediate stages, but only during the advanced training stage did plaintiff begin to have perceptible difficulty. As of July 23, 2001, plaintiff completed seven graded events; his average score was 2.978, below the squadron cutoff of 3.019. By August 6, 2001, plaintiff had completed twelve graded events, receiving the same average of 2.978, just slightly below the squadron cutoff of 2.982. On September 7, 2001, plaintiff flew Radio Instrument flight 15 ("RI-15") and received a score below the squadron marginal cutoff score. Then on September 24, 2001, plaintiff received "down" and "incomplete" scores for Radio Instrument flight 24 ("RI-24"). AR Tab 1 at 16. Following flight RI-24, it was determined that plaintiff had "multiple headwork errors" and needed "some extra time" to complete RI-24. AR Tab 1 at 17. Thus, on September 26 and October 1, 2001, plaintiff flew two extra flights, thereafter successfully completing RI-24 on October 2, 2001.

On October 4, 2001, plaintiff received another "down" rating for Radio Instrument flight 26 ("RI-26") and was subsequently referred to the PRB on October 5, 2001. The ATJ for RI-26 noted: "Very evident that [plaintiff] has the motivation and knowledge to make a good naval aviator. His knowledge of aim/far and limits was excellent. Needs practice putting it all together in a dynamic environment. Recommend 2 ETs [extra training] and continue . . . ." AR Tab 1 at 24.

On October 9, 2001, the PRB unanimously voted (3-0) to retain plaintiff, stating that plaintiff "has been identified with less than satisfactory performance in headwork during flight . . . . [Plaintiff] demonstrates very positive attributes for a career in naval aviation. His general knowledge is excellent and he has a strong determination to correct his inflight discrepancies . . . ." AR Tab 1 at 27. The PRB recommended that plaintiff receive two extra

training flights and continue with the SNA program. The PRB's findings and plaintiff's records were forwarded to Training Wing Four's commanding officer. The commanding officer on October 11, 2001, disapproved of the PRB's recommendations, concluding that plaintiff is

> a very motivated professional who has given his best effort to meet the standard. However, he is currently at an NSS of 23.1 with only 7 events to go to finish the advance phase. He currently needs 9 net above averages to meet the minimum waiver standards . . . to get his wings. Given his performance to date I have 100% confidence that he would not be able to finish within the standard.

AR Tab 1 at 27. He recommended that plaintiff be attrited. The commanding officer's recommendation to remove plaintiff from the program was forwarded to the Commodore of Training Wing Four, who, on October 23, 2001, "concurr[ed] with [the commanding officer that plaintiff] is too far behind at this point to consider it reasonable to meet even the minimum standards . . . ." AR Tab 1 at 27. On October 20, 2001, the Corpus Christi Caller-Times published an announcement listing plaintiff as having received his wings and graduated from the Naval Aviation Training Program.

On November 6, 2001, plaintiff submitted an informal request for reconsideration of his notification of removal from flight training. Upon the recommendation to allow him to present his case more fully, by memorandum dated November 13, 2001, plaintiff submitted a formal justification for continuation in the SNA Program to the Chief of Naval Air Training Command, Training Air Wing Four. Plaintiff contested that "[m]y status as mid-stage marginal should have been explained to me after RI-15 along with counseling in order to determine problem areas and the actions needed to be taken to correct them, [i].e. extra training flights, extra instruction per references . . . ." AR Tab 1 at 30. Plaintiff pointed out that "[i]t was evident that my flight leader as well as student control had not been tracking my NSS or my grades through jacket reviews . . . to alert me of my status at an earlier date so something could be done in order to complete the program successfully." AR Tab 1 at 30. Plaintiff explained that, following flight "RI-9, I approached my flight leader about my low grades and was told I had 'nothing to worry about.' . . . It is my opinion that my grades in the RI stage are not accurately portrayed because of the lack of counseling, extra flights and extra instructions." AR Tab 1 at 30. Plaintiff also noted that all the ATJs commented on plaintiff's "exemplary work ethic" and that the PRB also made "positive comments" about plaintiff's performance in the flight program. AR Tab 1 at 30-31.

On November 19, 2001, pursuant to CNATRAINST 1500.4F, a Training Review Board (the "TRB"), comprised of eight officers, convened to discuss the recommendation

4

of Training Air Wing Four's commanding officer to remove plaintiff from the SNA program based on performance. The TRB reviewed plaintiff's file "to ensure quality of training provided [consistent with the Flight Training Instruction]. . . continuity of training was accurate, and that there were no outside influences or extenuating circumstances." AR Tab 1 at 34. Although the TRB acknowledged "some syllabus deviations," the TRB assessed that "they would not have sufficient impact on his performance. They certainly would not have sufficient effect to raise his" score of 23.8 to a level that would reach "the substandard 30.0 or the marginal 35.0" level required to graduate from the SNA Program. AR Tab 1 at 34. Any additional flying time awarded to plaintiff would not raise his score any where "near the marginal 30.0." AR Tab 1 at 35.

The TRB found "[n]o doubt that [plaintiff] should have been officially informed of his marginal performance after the RI-15 ride. This is an error . . . that happened for many reasons, late completion of grade sheets, confusion caused by the events of 11 September, temporary stand down from flying and then the rapid ramp back up of flight operations . . . ." AR Tab 1 at 34. However, the TRB discounted as "extremely unlikely" that plaintiff was not aware of his "marginal status," given that "he approached his flight leader after RI-9 . . . to discuss his concern about his low grades." AR Tab 1 at 34. While the two "Downs" were plaintiff's first, plaintiff was "habitually and always hovering near the bottom of his class." Chiding plaintiff for "blam[ing] everyone and anyone for not tracking his . . . grades," the TRB observed that plaintiff took "little responsibility for his own neglect." AR Tab 1 at 34. The TRB stated that plaintiff "fails to realize that the training syllabus does not only serve to get student pilots through the program[,] but also functions to ensure that the military pilot standards remain high by attriting unsuitable pilot training candidates . . . ." AR Tab 1 at 35. On November 20, 2001, the TRB concluded unanimously, by a vote 8 to 0, to remove plaintiff from the SNA Program. The Deputy Chief of Naval Air Training formally responded to plaintiff's appeal to the TRB on June 26, 2002, informing plaintiff of the TRB's decision.

Per plaintiff's written request made on March 27, 2002, plaintiff had been redesignated as a Navy Surface Warfare Officer. Plaintiff served as a carrier airborne Combat Information Center Officer until he voluntarily resigned his commission and was honorably discharged in September 2003. By letter dated September 19, 2002, plaintiff's father, a combat veteran of Vietnam, urged Rear Admiral John Boyington to reconsider the Navy's decision to remove plaintiff from the SNA program in an effort to enable plaintiff to enter the North Carolina Air National Guard pilot training program for the C-130 Aircraft as an Interservice Transfer to the U.S. Air Force, "where he can pass or fail in C-130 training, and put to use two years of training otherwise wasted." AR Tab 1 at 50. Given that plaintiff has not been reinstated to the SNA program to date, and therefore never matriculated, he did not make this Interservice Transfer.

On August 6, 2004, plaintiff submitted a request to the BCNR for correction of his military record under 10 U.S.C. § 1552, claiming that he should have been awarded his wings as a Naval Aviator. Plaintiff contended that he was denied wrongfully the right to retake the flight event that he failed, as he had passed all other flights in the basic through advanced training phases. "The Navy denied me the right to retake that [flight] event and now admits it failed to follow its own procedure. No one should be attrited on this basis one week before being winged." AR Tab 1 at 55. By letter dated August 12, 2004, and per plaintiff's request, Senator Elizabeth Dole also submitted to the BCNR a request to review plaintiff's records.

The BCNR received plaintiff's application and requested, by letter dated January 3, 2005, an advisory opinion from the Director of Aviation Officer Distribution Division for the Navy. The advisory opinion was sought to assure a "fair and equitable decision in this case." AR Tab 1 at 59. The BCNR explained that the Director must review plaintiff's record and weigh plaintiff's complaint in light of Navy policies, regulations, and guidelines. On January 11, 2005, the Director issued his advisory opinion recommending disapproval of plaintiff's request for redesignation. The Director explained that plaintiff's low scores and decline in performance during the advanced stages of flight training did not justify extra flights to improve performance. "The purpose of training flights is to focus on remediation of specific performance problems, not overall declining performance . . . ." AR Tab 1 at 62. The Director continued, "Awarding [plaintiff] Navy pilot wings solely for the purpose of an Interservice Transfer . . . [to] the North Carolina Air National Guard is inappropriate and would severely compromise the high standards set by Naval [A]ir Training." Id.

By letter dated February 3, 2005, the BCNR informed plaintiff that his application for correction of military records had been transferred to the BCNR's "Performance Section" for an advisory opinion, which was enclosed. The BCNR advised plaintiff that the opinion was not binding, and, if plaintiff "wish[es] to respond to the advisory opinion or submit documentary material in support of [plaintiff's] application," plaintiff either must respond or request an extension of time within thirty days of the date of the letter. AR Tab 1 at 63. Plaintiff responded by letter dated February 22, 2005, requesting a personal appearance and additional time to submit materials in support of his case and made a "partial response" to the findings in the advisory opinion. AR Tab 1 at 65-66. Plaintiff pointed out that he could not "pinpoint in my training jacket" where he was allegedly rated in the bottom percent of his class. Plaintiff stated this his record reflects many positive comments, and also reveals that plaintiff had "an unusual amount of disruptions in training, due, for example, to medical issues . . . ." Id.

Plaintiff reminded the BCNR that the original three-member review panel of the PRB had voted unanimously to retain him in the program and to allow plaintiff to retake the last training flight. This three-member panel was the only group that knew plaintiff personally

6

and was familiar with his "abilities and potential." AR Tab 1 at 65-66. In appealing to the BCNR, plaintiff explained that at this point he requested his "wings and a piece of paper saying I deserved them." AR Tab 1 at 66. Plaintiff submitted the same letter again on March 19, 2005 to the BCNR.

By memorandum of December 8, 2005, the BCNR denied plaintiff's request to correct his military records. In making its decision, the BCNR considered the Director's advisory opinion dated January 11, 2005, plaintiff's service record, and plaintiff's letters dated February 22 and March 19, 2005.

Plaintiff's complaint filed in the United States Court of Federal Claims on January 22, 2008, was assigned to Chief Judge Edward Damich. Plaintiff alleges that the BCNR's denial of plaintiff's request to correct his military records was "arbitrary, capricious, and unsupported by substantial evidence." Compl. filed Jan. 22, 2008, ¶ 33.

Plaintiff alleges that he should not have been removed from the SNA Program, because the SNA Program failed to notify him that his status was marginal and that he was in danger of not graduating. Absent the Navy's failure to follow its own procedures, plaintiff posits that he could have improved his performance. The "purpose of a marginal designation is to help the student aviator identify steps needed to improve performance." Compl. ¶ 35. According to plaintiff, the Navy made an administrative error by not advising plaintiff of his marginal status "at the first sign of trouble" -- rather informing plaintiff at the end of the training phase, shortly before graduation. Compl. ¶¶ 35, 37.

On May 16, 2008, following two motions for extension of time to file its answer, defendant filed a RCFC 12(b)(6) motion to dismiss for failure to state a claim for which relief can be granted, arguing that plaintiff's complaint raises nonjusticiable issues. Alternatively, defendant moved for judgment on the administrative record pursuant to RCFC 52.1. Briefing was completed on July 24, 2008. On September 25, 2008, this case was transferred to the undersigned for decision.

**DISCUSSION**

I. Standards

   1. Justiciability

Plaintiff asserts that the Navy improperly removed him from the SNA Program and that the BCNR erred by not correcting his military records and by not granting plaintiff his wings as a Naval Aviator. Plaintiff seeks back pay and allowances pursuant to 37

U.S.C. § 204. His claims are within the court's jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000).1/ See Sargisson v. United States, 913 F.2d 918, 920 (Fed. Cir. 1990); Sanders v. United States, 594 F.2d 804, 810 (Ct. Cl. 1979). Defendant does not contest the court's jurisdiction, but the justiciability of plaintiff's claim.

> "The distinction between [nonjusticiability and lack of jurisdiction] is significant. In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded."

Sargisson, 913 F.2d at 921 (brackets in original) (quoting Baker v. Carr, 369 U.S. 186, 198, (1961)); see Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993). "A controversy is justiciable only if it is one which the courts can finally and effectively decide, under tests and standards which they can soundly administer within their special field of competence." Sargisson, 913 F.2d at 922 (internal quotations and citations omitted). Otherwise, the "'court would have no meaningful standard against which to judge the agency's exercise of discretion.'" Webster v. Doe, 486 U.S. 592, 600 (1988) (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)). Thus, defendant's challenge requires the court to examine plaintiff's claims and determine whether the court can afford him proper relief.

Although the Court of Federal Claims may have jurisdiction of this case under the Tucker Act, a court cannot review the military's exercise of discretion in personnel matters. Voge v. United States, 844 F.2d 776, 779-80 (Fed. Cir. 1988). Plaintiff argues that the court should require the Navy to grant plaintiff his wings as a Naval Aviator by reinstating him in flight training. See Compl. at 6. Granting such relief would require the court to substitute its judgment for the military's, because the court would be finding that plaintiff's ATJs reflect sufficient performance scores to justify continuation in the SNA program and

---

1/ The Tucker Act provides:

(1) The [Court] shall have jurisdiction to render judgment upon any claim against the United States founded either upon . . . an Act of Congress or any regulation of an executive department. . . .
(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position . . . and correction of applicable records, and such orders may be issued to any appropriate official of the United States.

graduation as a Naval Aviator, irrespective of the Navy's decision to the contrary. To the extent that plaintiff seeks such a substantive review, the court cannot engage in it.

Discretionary authority to correct military records lies with the Secretary of a military department. As 10 U.S.C. § 1552(a)(1) provides: "The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." The Secretary may act through a correction board. Id. § (a)(2). As defendant argues, Congress vested the ultimate authority for the determination of plaintiff's qualifications as a Naval Aviator in the Secretary of the Navy. See 10 U.S.C. §§ 6021, 6024 (2000). The Secretary of the Navy established the BCNR and gave it discretionary authority to "consider applications properly before it for the purpose of determining the existence of error or injustice in the naval records of current and former members of the Navy and Marine Corps." 32 C.F.R. § 723.2(b) (2008). Through the BCNR, the Navy acted and rendered its decision. This decision was within the Navy's purview, not the judiciary's.

> [J]udges are not given the task of running the [military] . . . . The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate [military] matters as the [military] must be scrupulous not to intervene in judicial matters.

Orloff v. Willoughby, 345 U.S. 83, 93-94 (1953). Justiciability, as it relates to this case, thus recognizes the deference given by the court to the Navy as the particular and competent authority to exercise discretion and make decisions in matters affecting its personnel. Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005).

2. Judgment on the merits

If the court had decided the claim was justiciable, the case, including any alleged procedural claims, appropriately could be resolved on a judgment on the administrative record. See RCFC 52.1. In military pay matters, the court reviews a plaintiff's case "through the prism of a correction board." Cohn v. United States, 15 Cl. Ct. 778, 789 (1988). In the present case, the BCNR denied plaintiff's claims. To overturn that decision, plaintiff bears the burden of demonstrating by "cogent and clearly convincing evidence," Arens v. United States, 969 F.2d 1034, 1037 (Fed. Cir. 1992), that the BCNR's decision was "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." Roth v. United States, 378 F.3d 1371, 1381 (Fed. Cir. 2004); see also Wronke v. Marsh, 787 F.2d 1569, 1576 (Fed. Cir. 1986) (stating that plaintiff is bound by correction board's interpretation unless it is

"established that [the board's] determination was arbitrary, capricious, contrary to law, or unsupported by substantial evidence").

Plaintiff argues that he should not have been removed from the SNA program one week before graduation; if he was in danger of not graduating because of his marginal scores, he should have been notified earlier, thereby affording him the opportunity to improve. Plaintiff postulates that the Navy violated its own procedures promulgated under CNATRAINST 1500.4F. Sargisson, 913 F.2d 918, is cited as authority that the Navy improperly failed to follow its own procedures and instructions under CNATRAINST 1500.4F. Plaintiff contends that these Instructions provide for "a series of procedural safeguards" for students that are labeled as having "marginal performance." Pl.'s Br. filed July 10, 2008, at 7; see Sargisson, 913 F.3d at 921 (stating that military is not required to place procedural or substantive limitations on Secretary's decisions; however, once Secretary promulgates instructions, actions contrary to such instructions are subject to judicial review); see also 10 U.S.C. § 6021 ("The number of officers and enlisted members of the Navy and the Marine Corps detailed to duty involving flying and to other duties in connection with aircraft shall be in accordance with the requirements of naval aviation as determined by the Secretary of the Navy."); 10 U.S.C. § 6024 ("Any officer of the naval service may be designated a naval flight officer if he has successfully completed the course prescribed for naval flight officers."). Plaintiff argues that he did not receive the benefit of these safeguards and that, if he had, he could have improved his scores and matriculated through the SNA program.

Plaintiff draws the court's attention to two provisions, paragraphs 715 and 718, of CNATRAINST 1500.4F to support his argument that the Navy violated its own "procedural safeguards" when it did not take "specific courses of action . . . to improve [plaintiff's] performance." Pl.'s Br. filed July 10, 2008, at 8. The first provision, paragraph 715, provides, in pertinent part:

> Early identification of marginal performance is key to the determination of actions the command and student must take to improve student performance. Marginal performance shall be identified to focus attention on the students whose performance, though technically passing, is substandard. Students' grades shall be reviewed weekly to determine marginal performance. A marginal review is done after completion of a minimum of four graded syllabus events or at the discretion of the squadron student control officer . . . .

The second provision, paragraph 718, explains that the purpose of the "marginal performance disposition" is to "highlight a student's trends, and apply practical steps to

determine what actions are required to prevent unsatisfactory completion." Plaintiff argues that he was counseled as mid-stage marginal on July 23, 2001, and as end-stage marginal on August 6, 2001, but was not awarded extra training flights until September 24, 2001, and October 4, 2001. On October 5, 2005, plaintiff was also referred to the PRB. The BCNR rejected plaintiff's arguments. 2/  The court previously has quoted key findings of the advisory opinion relied on by the BCNR. Significant to plaintiff's arguments before the court, the advisory opinion stated that

> [t]he purpose of training flights is to focus on remediation of specific performance problems, not overall declining performance. . . .
>
> Awarding [plaintiff] Navy pilot wings solely for the purpose of an Interservice Transfer . . .[to] the North Carolina Air National Guard is inappropriate and would severely compromise the high standards set by Naval air Training.

AR Tab 1 at 62. Although the BCNR relied on the advisory opinion, it also considered plaintiff's training records and the letters that he had submitted to the BCNR. The administrative record establishes that the BCNR's decision was supported by substantial

---

2/ Plaintiff suggests that it was improper for the BCNR to rely on an advisory opinion in making its decision upholding the recommendation not to remove plaintiff from the program. Pl.'s Br. filed July 10, 2008, at 10; Compl. ¶ 34; see also Def.'s Br. filed May 16, 2008, at 15 (stating that "Although not clear, it appears that plaintiff also takes issue with the fact that the BCNR relied upon an advisory opinion from the Navy Personnel Command when it made its determination on plaintiff's application for correction of military records."). The "function" of the BCNR "is to consider applications properly before it for the purpose of determining the existence of error or injustice in the naval records"; the BCNR is not an "investigative body." 32 C.F.R. § 723.2(b) (2008). The BCNR requested an advisory opinion to aid in its review of plaintiff's claim. The BCNR also reviewed plaintiff's record and the letters that he submitted.

A review board's reliance on an advisory opinion to aid its review of a record is consistent with the function of a reviewing body and does not render the BCNR's actions arbitrary, capricious, or contrary to law. It is an established practice for military review board to use advisory opinions when investigating an applicant's record fitness for service. Armstrong v. United States, 205 Ct. Cl. 754, 764 (1974); see also Koster v. United States, 685 F.2d 407, 412 (Ct. Cl. 1982) (in a non-adversarial context ex parte communication does not offend due process).

evidence. See Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (holding that court may disagree with correction board's decision, but cannot substitute its judgment where "reasonable minds" could reach differing results on facts presented).

Plaintiff does not dispute any facts, but takes issue with the BCNR's sustaining the decision to remove him from the SNA program. Although the court recognizes the disappointment that plaintiff suffered when, after years of training, he was removed the week before graduation, this decision reposed within the Navy's discretion. Paragraph 718(g) of CNATRAINST 1500.4F provides that, "[u]pon completion of extra training, the Operations Officer shall, dependant upon the student's demonstrated progress, either designate the student to continue training or in the event of questionable performance or failure to make progress . . . [can refer the student to the] PRB. Paragraph 719 states that "End-of-Phase marginal performance shall be identified to focus attention on students whose performance, though technically passing, is substandard and to determine if further training is or is not warranted." (Emphasis added).

Although the PRB initially voted to retain plaintiff in the program, the commanding officer and Training Wing Four's Commodore determined that plaintiff was "too far behind at this point to consider it reasonable to meet even the minimum standards." AR Tab 1 at 27. In answering plaintiff's informal request, dated November 6, 2001, to Training Wing Four appealing the decision to remove him from training, the Navy acknowledged that plaintiff should have received notice of his mid-stage marginal status following flight RI-15. See CNATRAINST 1500.4F ¶ 718. Nevertheless, the TRB, aware of this oversight, determined that, even if plaintiff was awarded extra training flights following flight RI-15, he would "[c]ertainly [be] no where [sic] near the marginal" bar needed to successful complete the program. AR Tab 1 at 35. The BCNR had ample basis to conclude that the evidence did not warrant reversal of the Navy's decision to remove plaintiff from the SNA program. AR Tab 1 at 60. This was a decision fully grounded on the factual record.

It is the Navy, not the court, that is the crucial decisionmaker with respect to plaintiff's qualifications to receive his aviator wings. The military must determine who is and is not fit to serve as a navel pilot. See Orloff, 345 U.S. at 94 ("judges are not given the task of running" the military); see also Brenner v. United States, 202 Ct. Cl. 678, 694 (1973) ("No court is in a position to resolve and pass upon the highly complicated questions and problems involved in the promotion procedure, which includes, but is not limited to, an analysis of the fitness reports and personnel files and qualifications of all of the officers considered.").

Based on the foregoing, plaintiff has failed to carry his burden to overturn the decision of the BCNR.

**CONCLUSION**

Although the court cannot provide the redress that plaintiff seeks because his claim raises nonjusticiable issues, plaintiff's claim deals with actions by the Navy that plaintiff views as unfair and improper, and the outcome of this case forecloses any career plaintiff has had or may have with the Navy. Therefore, it is important that the court give plaintiff's record and arguments thorough attention even if plaintiff ultimately is not awarded the legal relief that he seeks.

Accordingly, based on the foregoing, defendant's motion to dismiss is granted, and the Clerk of the Court enter judgment for defendant on the ground that plaintiff's claims are nonjusticiable.

**IT IS SO ORDERED**.

No costs.

s/ Christine O.C. Miller

_____
**Christine Odell Cook Miller**
Judge